UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges Fulton and Ortiz
Argued at Richmond, Virginia


ROY BLACK

v.      Record No. 0445-23-2

C. T. WOODY, JR., ET AL.

MEMORANDUM OPINION* BY
JUDGE JUNIUS P. FULTON, III
MARCH 19, 2024

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Joseph J. Ellis, Judge Designate

Gary R. Hershner for appellant.

John P. O'Herron (William W. Tunner; Rachel W. Adams;
*Thompson*McMullan, P.C., on brief), for appellee C.T. Woody, Jr.

Margaret F. Hardy (Christopher F. Quick; Brian P. Clarke; Sands
Anderson, P.C., on brief), for appellee NaphCare, Inc.


Roy Black filed a complaint in the Circuit Court of the City of Richmond alleging that

defendants Sheriff C.T. Woody, Jr. ("Sheriff Woody") and NaphCare Inc. ("NaphCare") provided

negligent medical care while Black was incarcerated, leading to the amputation of his left leg below

the knee.  Black appeals the final order of February 16, 2023, granting defendants' motion to strike

and dismissing the case with prejudice.

I.  BACKGROUND

Beginning on March 7, 2016, until his transfer to Retreat Hospital on April 1, 2016, Roy

Black was an inmate at the Richmond City Justice Center ("the jail").  On March 20, 2016, Black

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

began experiencing significant pain and coldness in his left leg due to a prior medical condition.[1] The lower part of Black's left leg turned "black as coal" and his condition was so debilitating that he could no longer walk normally, having to hop to get his food tray and medications. Black stated that he reported his condition to several unnamed deputy sheriffs and nurses who appeared on his tier at the jail, begging each of them for medical care and to be seen by a doctor. He also requested that he be allowed to call his treating physician who was familiar with his condition prior to his incarceration.

On March 31, 2016, Black encountered Nurse Baskerville at the jail and approached her about the condition of his leg. Nurse Baskerville told Black that he needed to submit a medical request after Black complained that he was in severe pain and needed to see the doctor. Black could not write the request himself and had his cellmate fill it out for him. The request read: "The stint in my left leg is completely messed up I am in serious pain; I need to see the doctor asap. Please help I am in a great amount of pain."[2] That evening, Black saw another nurse and described his symptoms to her as well, requesting that he be sent to the hospital. This nurse gave Black "two little pills" and did not send him to the hospital.

On the morning of April 1, 2016, Black saw Sergeant Abraham Bul come onto the floor and approached Sergeant Bul about the condition of his leg. Sergeant Bul recognized the severity of Black's condition. Black testified that Sergeant Bul immediately

> got on the mic, called down to medical. Medical sent up a wheelchair. I got in the wheelchair. He wheeled me down to medical, pushed me in. At that time the doctor [had me] sit up on the table and she looked at my foot and my leg, called

---

[1] Black was diagnosed with peripheral vascular disease ("PVD") in 2013. Black had previously undergone several surgeries to treat the disease, including a left-leg bypass, a thrombectomy to remove persistent clotting, and a toe amputation in December 2015 as a result of gangrene likely caused by small-vessel disease.

[2] Even though the request is dated 3-3-16, all parties agree that it was actually completed and submitted on March 31, 2016.

transportation. Transportation and two deputies came over and carried me to Retreat Hospital.

After being transported to Retreat Hospital, Black underwent a series of unsuccessful procedures and ultimately had to have his left leg amputated below the knee.

In September 2019, Black filed suit against Sheriff Woody and NaphCare, with whom Sheriff Woody had contracted to provide medical services at the jail. Black claimed that he was deprived of medical care while incarcerated at the jail based on his complaining of pain and coldness in his left leg beginning on March 20, 2016, and continuing until his transfer to Retreat Hospital on April 1, 2016. Black asserted two claims against the defendants. Count I alleged breaches of Virginia's common law and statutory duties, and Count II alleged violations of Article I, §§ 9 and 11 of the Virginia Constitution. The defendants each timely filed answers and demurred to Count II of the complaint, arguing that no private right of action exists for either constitutional provision. Black filed an answer to the demurrers arguing that because both §§ 9 and 11 are contained in the Bill of Rights, they are self-executing. After hearing arguments on August 6, 2020, the court sustained the demurrers and dismissed Count II with prejudice.

Black designated two expert witnesses during discovery. JoAnn Whitehead ("Nurse Whitehead") was designated to opine on the nursing standard of care and Mark Levy, M.D. ("Dr. Levy") was designated to opine on the medical causation of Black's injuries. In response to defendants' interrogatories requesting the identities and opinions of Black's experts, Black identified Nurse Whitehead and Dr. Levy as follows:

> The plaintiff will call Joann B. Whitehead, a Registered Nurse, to testify about the breaches of duty by the nurses and health care providers at the Richmond Justice Center in March, 2016. Ms. Whitehead will opine that all of the nurses and the health care providers at the Richmond Justice Center who observed the plaintiff breached the standards of care for the profession by failing to send the plaintiff to the hospital some two weeks prior to April, 2016, where the plaintiff could have received treatment for his obvious vascular condition. Ms. Whitehead will opine that the

delay in getting the plaintiff treatment caused him unnecessary suffering. Ms. Whitehead will base her opinions on her own training, review of the plaintiff's Complaint and a review of the Richmond Justice Center medical records.

The plaintiff will also call Mark M. Levy, M.D., . . . as an expert witness to testify about the injuries sustained by the plaintiff due to the failure to send the plaintiff to the hospital sooner than he was. Dr. Levy will opine that plaintiff should have been sent to the hospital sooner than he was. Dr. Levy will opine that plaintiff should have been sent to the hospital some two weeks prior to April, 2016 where he could have received an extension bypass, otherwise known as a jump gra[ft]. That would have been the appropriate medical treatment at the time. The delay in getting treatment for the plaintiff as set forth in Dr. Levy's certification which accompanies these answers, decreased the plaintiff's chances of avoiding amputation of his leg. At the very least, the amputation could have been avoided for several months. Dr. Levy will base his opinions on the allegations contained in the plaintiff's lawsuit, a review of the plaintiff's medical records, pre and post incident and the Richmond Justice Center medical records.

Black also provided certifications for Nurse Whitehead and Dr. Levy which stated:

I, Joann B. Whitehead, am a Registered Nurse. I supervise Licensed Practical Nurses and Certified Nursing Assistants and I am very familiar with their standards of care. I have reviewed the allegations contained in the lawsuit that has been filed in the Circuit Court of the City of Richmond, styled, *Roy Black v. C. T. Woody, Jr. and Naphcare, Inc.*, Case No.: CL17001318-00. I have further reviewed Roy Black's medical records for the treatment and care that he received while he was an inmate in the Richmond City Jail and following his release. Based on this information, I believe that I have a reasonable understanding of the facts in the case and in particular the medical treatment received or not received by Mr. Black as an inmate in the Richmond City Jail in March, 2016. I am of the opinion that all of the nurses at the jail and all medical personnel breached the standard of care for their profession by failing to send Mr. Black to the hospital some two weeks prior to April 1, 2016 where he could have received treatment for an obvious vascular condition; This would have been the appropriate medical treatment at that time; The delay in getting treatment for Mr. Black caused him unnecessary suffering.

I, Mark M. Levy, M.D., have reviewed the allegations contained in the lawsuit that has been filed in the Circuit Court for the City of Richmond, styled, *Roy Black v. C.T. Woody, Jr. and Naphcare, Inc.*, Case No.: CL17001318-00. I have reviewed the medical

records that relate to the treatment and care that was received and not received by Roy Black in the Richmond City Jail including the records in March, 2016. I have further reviewed Roy Black's medical records that occurred before he was incarcerated at the Richmond City Jail in March, 2016 and his medical records for the treatment that occurred while he was still an inmate at the Richmond City Jail and following his release. Based on this information, I believe I have a reasonable understanding of the facts in the case and in particular the medical treatment received or not received by Mr. Black as an inmate in the Richmond City Jail in March, 2016. I am of the opinion and hereby certify that Mr. Black should have been sent to the hospital some two weeks prior to April 1, 2016 where he could have received an extension bypass otherwise known as a jump graft; This would have been the appropriate medical treatment at that time; The delay in getting treatment for Mr. Black as set forth in this certification decreased Mr. Black's ability of avoiding amputation even without the delay in treatment, in all likelihood Mr. Black could have delayed the amputation of his leg.

The defendants took the depositions of Nurse Whitehead and Dr. Levy in August 2021. In September 2021, the defendants filed six motions *in limine*.[3] NaphCare filed a "Motion to Preclude any Evidence, Testimony, or Argument that NaphCare, or any of its Employees or Agents, Breached the Standard of Care Prior to March 31, 2016" and a "Motion to Preclude Argument that Plaintiff is Entitled to Compensation for any Alleged Damages that Arose Prior to March 31, 2016." Jointly, the defendants filed a "Motion to Exclude any Testimony, Evidence, or Argument that Defendants or Their Agents Could Have Prevented Plaintiff's Amputation or Delayed it Beyond Four Months." The trial court granted these motions *in limine*, precluding Nurse Whitehead from testifying that NaphCare employees breached the standard of care prior to March 31, 2016, and precluding Dr. Levy from testifying that an earlier intervention would have delayed Black's inevitable amputation by more than four months.

Trial began on January 9, 2023, with Black testifying first, followed by a series of employees of the Richmond City Sheriff's Office who were questioned about the procedures for

---

[3] Only three of these motions *in limine* are at issue on appeal.

an inmate hospital transfer including how officers are to remain with inmates once they are transferred to the hospital. The deposition testimony of Sheriff Woody was then read into the record. Sheriff Woody testified that inmates may make medical complaints via a form in their pod or by complaining to a staff member, that inmate transfers to the hospital "could be by way of ambulance or the sheriff deputy in transportation," and that a deputy is assigned to follow the ambulance if an inmate is transported in one.

Black then called Nurse Whitehead. On direct examination, Nurse Whitehead testified that she had been a registered nurse since 2015. She stated that she was "aware" of the standards for nurses' evaluations of patients with a history of vascular disease, and she replied "[n]o" when asked if the standards for nurses differ depending upon the setting such as if someone is in jail. Nurse Whitehead was then asked if she had "an active clinical practice in nursing in 2015 and 2016" to which she responded, "[y]es." Black then moved to qualify Nurse Whitehead as an expert "in the field of nursing."

After Black sought to qualify Nurse Whitehead as an expert in the field of nursing, NaphCare conducted a voir dire examination. On voir dire, Nurse Whitehead testified that she had worked at Memorial Regional Medical Center in the progressive care unit (PCU) since becoming a registered nurse in 2015 through 2019. Nurse Whitehead stated that as a nurse in the PCU, she would never be in the position to determine whether a patient needed to go to the hospital. Nurse Whitehead testified that she had never worked in a vascular surgery clinic, doctor's office, or jail.

Following voir dire, NaphCare moved to exclude Nurse Whitehead's proffered testimony that its employees had breached the standard of care by failing to timely send Black to the hospital on or after March 31, 2016. NaphCare asserted that Nurse Whitehead failed to satisfy the requirements of Code § 8.01-581.20, noting that there were clear differences between

correctional nursing and nursing in a PCU in an inpatient facility and that Nurse Whitehead did not testify to any "familiarity with the procedures, the process, how inmates access care, how that care is provided, what is necessary in terms of transferring patients or sending patients out." NaphCare then argued that as Nurse Whitehead's sole designated opinion was that NaphCare's employees breached the standard of care by failing to timely send Black to the hospital—a procedure she had no familiarity with based on her background in exclusively inpatient care— her entire testimony should be excluded. The trial court granted NaphCare's motion to exclude Nurse Whitehead's testimony.

Black's counsel proceeded "for the purposes of expediency" to proffer Dr. Levy's proposed testimony rather than call him to testify based on the theory or understanding that the defendants would file a motion to strike the evidence because the standard of care expert's testimony had been excluded. Following the proffer, defendants each made a motion to strike Black's evidence. In Sheriff Woody's motion to strike, counsel argued that there had been no testimony by any witness that any of the Sheriff's deputies did anything wrong or breached any duty owed to Black, and therefore, there was no factual or legal basis to support any claim against Sheriff Woody. Black did not contest either motion. When invited by the trial court to respond to the motions, Black's counsel admitted that, without the evidence suggested in his proffer, he could not meet his burden of proof. The trial court granted the motions to strike and dismissed the case with prejudice. This appeal follows.

II. ANALYSIS

Black assigns error to the dismissal of his case, asserting that: (1) the trial court erred in excluding the expert testimony of Nurse Whitehead; (2) the trial court erred in sustaining the demurrers to Count II of Black's complaint; (3) the trial court erred in sustaining the motions *in limine* by limiting the testimony of Nurse Whitehead to breaches of the standard of care only

occurring on March 31, 2016; (4) the trial court erred in sustaining the motions *in limine* by limiting Black's claim to only four months loss of his leg; and (5) the trial court erred by sustaining the motions to strike Black's evidence.

### A. *The trial court's exclusion of Nurse Whitehead's expert testimony*[4]

"Whether a witness demonstrates expert knowledge of the appropriate standards of the defendant's specialty is a question largely within the sound discretion of the trial court." *Sami v. Varn*, 260 Va. 280, 284 (2000) (citing *Lawson v. Elkins*, 252 Va. 352, 354 (1996)). "Where the admissibility of expert testimony is challenged on appeal, the standard of review is whether the trial court abused its discretion." *Currie v. Commonwealth*, 30 Va. App. 58, 64 (1999). "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (quoting *Beck v. Commonwealth*, 253 Va. 373, 385 (1997)). Further, "[a circuit] court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (alterations in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

Black makes one argument on appeal pertaining to the trial court's decision to exclude Nurse Whitehead's expert testimony: that the nursing standards of care do not differ based on facilities. He contends that the nurses of NaphCare did not have a lower standard of care for their profession simply because they worked in a correctional facility and, moreover, that the evidence presented at trial showed that it was a simple matter to transport an inmate from the jail

---

[4] Based on the finding that the trial court did not err in excluding Nurse Whitehead's testimony, we do not address Black's third and fourth assignments of error relating to the trial court's granting of defendants' motions *in limine*.

to the hospital.  While we generally might agree with Black's assertion that the standard of care does not differ based on whether a nurse works in a correctional facility or not, Nurse Whitehead's expert designation was that she would opine that a breach occurred when nurses at the jail *failed to send* Black to the hospital.  Although Nurse Whitehead testified that she was aware of the standard of care for nurses evaluating patients with a history of vascular disease and that the standard of care remained the same, regardless of the setting, the pre-trial designation provided by Black was materially different from the foregoing.  Her sole designation specifically stated that the standard of care was breached by the *failure to timely send* Black to the hospital rather than failing to assess Black's PVD and recommend further treatment.  Despite Nurse Whitehead's apparent qualification to opine on the assessment of PVD, Black's designation of Nurse Whitehead's expert testimony did not include assessing Black's PVD.

Under Rule 4:1(b)(4)(A)(i),

> [a] party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Applying Rule 4:1(b)(4)(A)(i), the Supreme Court of Virginia, in *John Crane, Inc. v. Jones*, 274 Va. 581 (2007) held that "a party is not relieved from its disclosure obligation under the Rule simply because the other party has some familiarity with the expert witness or the opportunity to depose the expert." *Crane*, 274 Va. at 592.  There, the disclosure at issue stated that the expert would testify to the pathological diagnosis and testing he performed; the association between asbestos and the alleged disease process involving the plaintiff; the contribution, if any, of exposure to the defendant's products and products of other companies in the causation of plaintiff's asbestos-related disease; and the burden of asbestos in plaintiff's lungs and its contribution, if any, in causing plaintiff's asbestos-related disease.  *Id.* at 591-92.  However, the

disclosure included nothing about the expert opining on asbestos in the ambient air. *Id.* at 592. Crane argued that the expert's opinions including those regarding asbestos in the ambient air were "well known" to the Estate of the plaintiff because it questioned the expert about the opinions during a deposition. *Id.*

Here, the pretrial disclosure of Nurse Whitehead's testimony was that she would "opine that all of the nurses and the health care providers at the Richmond Justice Center who observed the plaintiff breached the standards of care for the profession by *failing to send* the plaintiff to the hospital." (Emphasis added.) Her testimony at trial was therefore limited to opining on the actual transfer of Black from the jail to the hospital, not the assessment of Black's condition by nurses at the jail and subsequent recommendation that he be transferred to a hospital for further treatment. Further, just as the expert in *Crane* was not designated to opine on "asbestos in the ambient air," Nurse Whitehead was not designated to opine on the standard of care related to assessing PVD. Simply because the defendants were able to depose Nurse Whitehead and were aware of her opinions regarding the standard of care in making the necessary assessment in this case, Black was not relieved of his disclosure obligation under Rule 4:1(b)(4)(A)(i).

Because Black's pre-trial designation regarding Nurse Whitehead's testimony stated only that she would opine on the failure to send Black to the hospital, the trial court did not abuse its discretion in excluding her testimony based on its finding that she was not familiar with the institutional policies associated with transferring an inmate to the hospital.

B. *The trial court's sustaining of defendants' demurrers to Count II of Black's complaint*

"A demurrer tests the legal sufficiency of the facts alleged in a complaint assuming that all facts alleged therein and all inferences fairly drawn from those facts are true." *Givago Growth, LLC v. iTech AG, LLC*, 300 Va. 260, 264 (2021). "This Court reviews a circuit court's decision to sustain a demurrer de novo." *Id.*

Further, "as a general rule, the sovereign is immune not only from actions at law for damages but also from suits in equity to restrain the government from acting or to compel it to act." *Gray v. Sec'y of Transp.*, 276 Va. 93, 102 (2008). However, if the relevant provisions of the Virginia Constitution are "self-executing," then that is an express constitutional waiver of sovereign immunity. *Id.* "A constitutional provision is self-executing when it expressly so declares." *Id.* at 103 (quoting *Robb v. Shockoe Slip Found.*, 228 Va. 678, 681 (1985)); *see, e.g.*, Va. Const. art. I, § 8. "[C]onstitutional provisions in bills of rights," declarations of common law, and "provisions which specifically prohibit particular conduct" are generally considered self-executing, even with no express declaration. *Gray*, 276 Va. at 103 (quoting *Robb*, 228 Va. at 681-82). This Court reviews de novo whether a provision of the Virginia Constitution is self-executing. *See id.* at 101-07; *see also Robb*, 228 Va. at 681-83.

Black makes one argument on appeal pertaining to the trial court's decision to sustain the defendants' demurrers as to Count II of his complaint: that the law in Virginia is clear that constitutional provisions in bills of rights and those merely declaratory of the common law are usually self-executing and, therefore, a lawsuit may be filed to enforce a violation of those rights. Count II of Black's complaint states in relevant part that:

> The actions and omissions of the defendants and their employees therefore constitute cruel and unusual punishment and/or the denial of the due process of law, as prohibited by paragraphs 9 and 11 of Article I of the Constitution of Virginia.

The Supreme Court of Virginia, in *Robb*, established that:

> A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.

*Robb*, 228 Va. at 682 (quoting 1 T. Cooley, Constitutional Limitations 167-68 (8th ed. 1927)). Further, the Court in *Robb* established a four-part test for determining when a constitutional provision provides a private right of action. First, does the provision contain a declaration that it is self-executing? *Id*. at 681. Second, is the provision contained in the Bill of Rights? *Id.* Next, is the provision declarative of common law? *Id.* Finally, does it provide rules by which its principles may be given the force of law? *Id.* at 682. As to Article I, § 9, there is no declaration within § 9 that it is self-executing. While it is contained within the Bill of Rights and is declarative of common law, there are no rules contained within § 9 by which the principle that "cruel and unusual punishment [ought not be] inflicted" may be given the force of law. Therefore, § 9 cannot be considered to be self-executing and, therefore, no private right of action exists under § 9.

Applying the test to the due process clause of Article I, § 11, nowhere in § 11 is there a declaration that it is self-executing. Like § 9, § 11 is contained within the Bill of Rights and is declarative of common law, but there are no rules by which the principle "[t]hat no person shall be deprived of his life, liberty or property without due process of law," are to be given the force of law. Conversely, the property taking clause of Article I, § 11 does lay down rules by which some of its principles may be given the force of law, stating in relevant part that "[j]ust compensation shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking." Therefore, the due process clause of § 11 cannot be considered to be self-executing and no private right of action exists under this clause.

The trial court here did not err in holding that §§ 9 and 11 of Article I of the Virginia Constitution are not self-executing and that no private right of action exists for Black's claims under them. For the above reasons, we affirm the ruling of the trial court sustaining the defendants' demurrers to Count II of Black's complaint.

*C. The trial court's granting of defendants' motions to strike Black's evidence*

"We review a circuit court's decision on a motion to strike in the light most favorable to the non-moving party, and the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 209 Va. 62, 73 (2015)).

Based on our holding that the trial court did not err in excluding Nurse Whitehead's testimony as Black's standard of care expert and his concession that he could produce no evidence establishing a prima facie case against Sheriff Woody, we also find that the trial court did not err in granting the defendants' motions to strike Black's evidence.[5]  For these reasons, we affirm the finding of the trial court.

### III.  CONCLUSION

The trial court did not err in excluding Nurse Whitehead's testimony on the standard of care owed to Black, and subsequently in granting the defendants' motions to strike Black's evidence.  Further, the trial court did not err in sustaining the defendants' demurrers to Count II of Black's complaint because Article I, §§ 9 and 11 are not self-executing, and therefore, no private right of action exists for these claims.

*Affirmed.*

---

[5] In medical negligence cases, the burden of proof rests on the plaintiff and to meet that burden, Black was required to prove, through expert testimony, "the applicable standard of care, a deviation from that standard, proximate causation, and damages." *Rogers v. Marrow*, 243 Va. 162, 167 (1992) (citation omitted).